FARNUM v. PATCH & a.

Unincorporated "stockholders," taking certain numbers of "shares," according to their written agreement, "at $25 per share, for the purpose of starting a grocery store," are partners; and their liability to share losses is not limited by their opinion that, for some unexplained legal reason, it is limited to the amount paid for their shares.

BILL IN EQUITY, against the plaintiff's alleged copartners, for contribution.    Facts found by a referee.    In 1875, there was an organization in Francestown called "Oak Hill Grange."    Regular meetings. were held once in two weeks.    The parties to this bill, with many others, were active members, except Manahan.    In February or March, 1875, a proposition was introduced in regard to starting a store.    The subject was discussed at several meetings, and the parties to this bill nearly all took part in the discussion. The general talk was, that the prices of goods such as are usually kept in a country store would be lessened in such a store.    The amount necessary for such an undertaking was named at $1,500.

The question of liability of individuals was talked of, and the general understanding was, that no one would engage in this if he were to be made liable beyond such sum as he saw fit to contribute, or the number of shares he should take. It was stated in the grange, in the discussion about starting the store, that the "co-operative system" and the "protective union system" would not answer, because these or any such system would make them partners, and they would not engage in any such enterprise to become individually liable. Those who signed to take stock, in their own minds thought that the only difference between them in their relation to the store and other members of the grange was, that the stockholders contributed stock, and others did not. There was not any discussion or talk among them upon this difference.

The question of the place for the store was discussed, some favoring Farnum's cottage, and others Bradford's store. A committee of three, viz., W. H. Farnum, who is the plaintiff, and Woodward and Patch, two of the defendants, were appointed by the grange, at one of their meetings, to see Bradford about the purchase of part of his goods, and on what terms the store could be hired. At this meeting or some other, Patch declined to act, and Savage, one of the defendants, was appointed in his place. The style of sign for the store was discussed in the grange, and it was voted to have the sign "Francestown Grange Store." At one of the grange meetings a paper was written by the plaintiff, of which the following is a copy, and signed there by a few, and afterwards by others:

"We, the undersigned, *Members* in *Oak Hill Grange*, agree to take the number of shares set against our names at $25.00 per share, for the purpose of starting a Grocery Store. Said stockholders to decide upon the location for said store, and make all other arrangements necessary to carry into operation said store."

|  | Shares. |  | Shares. |
|---|---|---|---|
| W. H. Farnum, | 8 | Jesse Woodbury, | 2 |
| Hiram Patch, | 4 | John C. Dodge, | 1 |
| Jesse P. Woodbury, | 4 | Mrs. M. Balch, | 4 |
| H. G. Simpson, | 4 | Joseph L. Duncklee, | 2 |
| A. L. Savage, | 8 | George A. Duncklee, | 4 |
| H. F. Campbell, | 4 | Jonathan Danforth, | 2 |
| F. H. Duncklee, | 2 | Joseph Manahan, | 2 |
| A. B. Woodward, | 4 | E. W. Colburn, | 4 |
| Wm. A. Lord, | 2 | W. H. Lincoln, | 3 |

Farnum, Woodward, and Savage, after this paper was drawn, acted as a committee, and managed the business relating to starting and running the store. There were three or more informal meetings of the parties to this writing at Farnum's hotel. They were not all present at any one meeting, but all except Mrs. Balch were present at some one or more of the meetings. At these meetings

the committee reported what steps had been taken to secure a store. At one of these meetings it was reported that Bradford's store could be had with $1,500 of his stock, and Bradford was invited to the meeting. He appeared before the meeting, and stated that he had offered to the committee, Farnum, Woodward, and Savage, the store at a certain rent, and goods to the amount of $1,500 at cost, to be selected from his stock of about $4,000. At this meeting were Farnum, Woodward, Savage, Jesse P. Woodbury, G. A. Duncklee, F. H. Duncklee, Simpson, Patch, and others. It was decided at this or some subsequent meeting to take the stock of $1,500, and that John M. Parker of Goffstown should select it. Parker afterwards did select it. The goods of Bradford were bought on thirty days. The same committee took possession of the store in April, 1875, and placed a sign upon it, as had been voted in the grange. Jesse P. Woodbury was employed as clerk, and Savage, with the clerk, took charge of the store. Farnum collected of the subscriptions to the amount of $1,325, and with that money, Savage, and John M. Parker as adviser, went to Boston, and bought about $1,300 of goods. In a week or two after this, Savage went to Boston again, and bought goods, and paid for them from money taken at the store for sales, and also from money hired at the bank upon the names of Farnum, Woodward, and Savage. The business was thus commenced under the supervision and direction of the three members of the committee. Money was hired at the bank and of individuals by the committee, in their names, and used for buying goods. The business continued in this way under the committee till April, 1876, when, upon account taken, the following was the standing of the business:

Inventory of goods April, 1876, in writing of W. H. Lincoln:

| | | |
|---|---|---|
| Amount of goods on hand, | $7,378.18 | |
| Amount due on books, | 2,584.72 | |
| Cash on hand, | 490.21 | |
| | | $10,453.11 |
| Error, | | 100.00 |
| | | $10,353.11 |

RESOURCES.—(A Balance Sheet.)

| | | |
|---|---|---|
| Stock as per inventory April 11, 1876, | $7,297.79 | |
| Account on Ledger due Store, | 2,602.85 | |
| Cash as per cash account, | 481.17 | |
| | | $10,381.81 |

LIABILITIES.

| | |
|---|---|
| Bills payable on Bill Book, | $649.18 |
| Accounts payable on Ledger, | 452.42 |
| Notes payable, | 7,100.00 |

| | |
|---|---:|
| Stock capital, | 1,375.00 |
| Store Rent, | 80.00 |
| Interest due on stock capital, | 82.50 |
| W. H. Lincoln, services, | 183.00 |
| A. L. Savage, services, | |
| | ————$9,922.10 |
| | $459.71 |

The committee first employed J. P. Woodbury, one of the sub-scribers, as clerk in the store for about six months, and then he left, and they employed Lincoln, one of the subscribers, who remained until 1877. Savage, except the first bill, bought all the goods for the store, and he, Woodbury, and Lincoln sold all the goods which were sold in the store from April, 1875, to Nov. 7, 1876. An average stock of from $5,000 to $7,500 was kept. Far-num and Woodward took no part in the sales or direction about buying or selling, but signed notes with Savage from time to time to borrow money to buy goods for the store, and to renew old notes. All of the subscribers were in the habit of buying goods at the store during said time, and were often in the store. The subscribers had no advantage as to prices above any one who came to buy. No meeting of the subscribers was ever called or held after April, 1875. No one except the committee and clerks took any part or gave any direction about the business of the store. The several meetings held in April were without notice. The business was done under the name of "Francestown Grange Store." Books of account were kept in this name. A book called stock book was kept, in which were the following entries:

STOCKHOLDERS OF FRANCESTOWN GRANGE STORE.

| Date. | Names. | | No. of shares. |
|---|---|---|---:|
| April 12, 1875. | William H. Farnum, Francestown, N. H., | | 8 |
| "    "    " | Hiram H. Patch, | "    " | 4 |
| "    "    " | Jesse P. Woodbury, | "    " | 4 |
| "    "    " | H. Y. Simpson, | "    " | 4 |
| "    "    " | A. L. Savage, | "    " | 8 |
| "    "    " | Henry T. Campbell, | "    " | 4 |
| "    "    " | Francis H. Duncklee, | "    " | 2 |
| "    "    " | Abner B. Woodward, | "    " | 4 |
| "    "    " | Wm. A. Lord, | "    " | 2 |
| "    "    " | Jesse Woodbury, | "    " | 2 |
| "    "    " | Joseph F. Duncklee, | "    " | 2 |
| "    "    " | Mrs. Mark Balch, | "    " | 2 |
| "    "    " | Joseph Manahan, | "    " | 2 |
| May 26,    " | Wm. H. Lincoln, | "    " | 3 |

This last entry was written by Lincoln, he being then the clerk.

September, 7, 1875, Simpson, being about to leave town, sold his stock to Savage for $90, and there was entered on the stock book the following: "April 12, 1875, A. L. Savage, four (4) shares." These were the shares of Simpson, whose name was at that or some subsequent time erased from the book. From the starting of the store in April, 1875, to Sept. 7, Simpson lived near the store, and bought goods from day to day, and nearly every day, but then left town, and had no knowledge of the business afterwards. At the time he sold out he did not know that money had been borrowed for the store, and did not inquire. He did not know or understand that he became liable for any debts of the store. He understood or thought that the grange started the store, and was responsible for everything, and that the stockholders advanced the money to the grange to buy goods. Money had been borrowed at the time he sold out, which had not been paid except by renewal of notes.

On the stock book, opposite the name of Jesse P. Woodbury, is the following entry: "Dec. 30, 1875, transferred and assigned to A. L. Savage, Wm. H. Farnum, and A. B. Woodward." Said Woodbury was clerk in the store for about one month, April, 1875, and he continued to buy goods there till November, 1877. He was paid $100, and interest from the time it was put in. He was paid in money and goods from the store, and on the ledger, to Wm. H. Farnum, A. L. Savage, and A. B. Woodward, was charged to each, "Paid J. P. Woodbury's stock, $35." Woodbury was paid for his services out of the store, and understood that he was at work for the subscribers to the stock. When he sold his shares as above, he gave the following receipt: "January 18, 1876. Received one hundred and five dollars, in full payment of stock in Francestown Grange Store, standing in my name Dec. 30, 1875.

                                        J. P. Woodbury."

On the stock book, opposite the name of Joseph Manahan, is the following: "May 30, 1876, transferred and assigned to A. L. Savage, Wm. H. Farnum, and A. B. Woodward." This was paid out of the store, and charged to the accounts of Savage, Farnum, and Woodward. Manahan did not sign the agreement, and did not authorize any one to sign his name. He did not agree to take any stock or shares. He was not a member of the grange, but was present in April when members of the grange were talking about starting the store, and then gave $50 to help the enterprise. He knew nothing about the books, and took no part in the business of the store. At the time he gave the $50, he stated that he would invest that as a gift. They offered to pay him in May, 1876, and he took it.

On the stock book, opposite the name of Henry F. Campbell, is the following: "July 1st, 1876, transferred and assigned to Wm. H. Farnum, A. L. Savage, and A. B. Woodward." The $100 for the four shares with interest was paid to Campbell out of the

store in goods and cash, and charged to Farnum, Savage, and Woodward, one third each.    Campbell bought goods at the store from time to time from the opening till 1877.

The business continued under the general management and direction of the committee, Savage doing all or nearly all of the business until November 7, 1876, when Savage proposed to Farnum and Woodward to buy all the property of the store and pay all liabilities.    Farnum and Woodward made the bargain with him that he should have all the goods, accounts, and dues of the store, and should assume and pay all its liabilities, and pay to such stockholders as saw fit to take it the amount paid for their stock and interest.    He also agreed to pay all the outstanding notes within thirty days.    No bond or security was taken from him for the fulfilment of his agreement.    Farnum and Woodward considered him good at the time.    He was then reputed a man of good business habits and character, worth money, and in good credit. He paid interest on notes, and renewed some notes after this, but continued in the same store till January, 1878, and then failed and went into bankruptcy, and paid a small per cent.

There are now outstanding notes, given in 1875 and 1876 by said committee, in their individual names, for money which started the store and continued it.    On the stock book, opposite the name of William H. Farnum, is the following: "1876, November 7, transferred to A. L. Savage, with interest to date."    Under the same date there is a similar entry, that the Jesse P. Woodbury stock, the Henry F. Campbell stock, the Joseph Manahan stock, which had been transferred to the three, was all transferred to Savage, so that Farnum and Woodward on that day transferred to Savage all the stock standing in their names.    Farnum and Woodward were credited in their account on the ledger with the amount of stock in their names, and the same amounts were charged to Savage on his account.    The same books were kept by Savage after November 7 as before.    The stock of the others was sold and transferred to Savage by the several persons named, and entered on the stock book as follows:

Hiram Patch, December 30, 1876.

Francis H. Duncklee, December 15, 1876.

Jesse Woodbury, January 9, 1877.

Joseph F. Duncklee, January 1, 1877.

Jonathan Danforth, January 1, 1877.

Mrs. Mark Balch, March 31, 1877.

William A. Lord's stock was transferred to Farnum, Woodward, and Savage, June 23, 1876; and Farnum and Woodward transferred it to Savage November 7, 1876.

The names of John C. Dodge, E. W. Colburn, and G. A. Duncklee do not appear upon the stock book, for the reason that they never paid for their stock.    John C. Dodge was a member of the grange,

and was present and took part in the discussion about the store, but never signed the agreement nor authorized it, and never took stock or agreed to take it.    E. W. Colburn signed the agreement, but never paid for it.    George A. Duncklee signed the agreement, but did not pay for the stock.    He was not asked to pay for it.

At the time of sale to Savage, November 7, 1876, there were bills for goods overdue against the store to the amount of about $1,700, more or less.    Farnum and Woodward believed the store solvent at that time.    They inquired afterwards several times of Savage about his payment of the outstanding notes, and were told they were not paid.    They took no steps to compel Savage to pay. No one of the stockholders, after the sale in November, 1876, made any inquiries, or did anything to compel Savage to pay.

The stockholders knew the amount of stock subscribed, and knew, from seeing the quantity of goods in the store, and the amount of business, and the kind of goods after the opening of the store and during the continuance of the business, that goods were bought on credit, or money borrowed to buy the goods.    The committee knew all the facts.    The other stockholders made no inquiries about the facts, and were not informed by the committee or any one.    The committee never called any meeting of stockholders after the opening of the store, and no meeting was held, and never consulted or asked any of the stockholders anything about the business of the store, or the borrowing of money, buying or selling on credit, or the selling out in November, 1876.    At the time Woodward and Farnum sold to Savage, November, 1876, they and Savage understood that the other stockholders had the right to sell their stock or keep it.    The other stockholders did afterwards sell to Savage the stock as above stated, and knew of the sale to Savage at the time of the sale, or at the time each sold to Savage.

The stockholders and the committee all believed that there was no partnership, and no personal responsibility at the commencement of the business, and until 1878.    They all thought they risked only their stock.    As each one sold out his stock, he and all others concerned thought that they were relieved from all connection with the store or from all further liability, although nothing was said or done about it.    Every stockholder believed at the commencement of the business, and during the time the store was kept, that the business would be and was so managed as to pay all debts. There was no discussion or talk outside of the grange, or at the meeting of the stockholders, about partnership or individual liability.    Some of the stockholders signed the paper and paid for the stock without thinking of the question of partnership or liability. Most of them signed believing in their own minds that they would not become liable as partners, or be liable to lose anything beyond the amount of their stock.    All of the stockholders, and most, if not all, of the members of the grange, had confidence in the suc-

cess of the enterprise, and that the business would pay all expenses, and they get goods at less prices than at other stores.

Farnum, Savage, and Woodward were chosen a committee in the grange. There was no vote or formal action of any kind by the stockholders authorizing this committee to act; but the stockholders, at the informal meetings above named at Farnum's hotel, in their talk about buying goods and starting the store, recognized Farnum, Savage, and Woodward as a committee, and the committee talked at said meetings as though they were acting as a committee, and not for themselves. Farnum, Woodward, and Savage, after they were appointed a committee by the grange, in the negotiations for the store, buying the goods of Bradford and starting the business of the store, and in running the store, thought they were acting as such committee. It was talked in the grange, and in the meetings at Farnum's, that the committee was to buy and sell for cash; but the stockholders, all or most of them, bought at the store on credit, and all understood, from the quantity and kind of goods, that goods were bought on credit, or that money was borrowed to buy with. It is claimed by the plaintiff that a very considerable portion of the $2,602.85, shown by the balance-sheet of April, 1876, was not collectible. It is claimed that the notes payable, $7,100, shown in the balance-sheet, are substantially the notes referred to in the plaintiff's bill.

If Savage had fulfilled his agreement to take the property and pay the debts, the sale to him would have been a judicious arrangement for the debtors and creditors.

*Rand*, for the defendants. The question in this case is one of agency, rather than one of partnership. The plaintiff claims that the defendants are holden upon certain notes, which they never signed. Did they authorize the plaintiff to make the notes for them ? That is the question. The plaintiff says they did, because they were partners with him in a certain enterprise, for the furtherance of which the notes were made.

1. Were the plaintiff and the defendants partners ? The plaintiff, and most of the defendants, signed a certain writing reported in the case. Did that act make them partners *inter se ?* Whether or not it made them partners as to third persons, is a matter not in any way involved in this case. By the writing, they simply agreed to become shareholders or stockholders in starting a grocery store, and making arrangements to carry it into operation. Would a score of men and women, of ordinary intelligence, who wanted to form a general partnership in the grocery business, be likely to draw up the articles of partnership in that way ? One would suppose that somewhere in such articles it would be possible to find the word *partner*, or *partners*, or *partnership*, or some word of equivalent import. Persons who contribute funds to help forward some particular enterprise may be either partners or creditors.

*Eastman* v. *Clark*, 53 N. H. 276. Now it may be said, with entire safety, I think, that the writing in this case is as favorable, to the view that its signers were mere creditors who paid their money to start a grocery store, as it is to the view that they meant to make themselves general partners in the grocery business. The document is very brief. It hardly purports to be a contract of any kind. If the meaning of its terms is doubtful, it must be interpreted in the light of the facts proved in the case.

2. What is a partnership? "A partnership is a joint understanding to share in the profit and loss. If there is no estoppel, the question is, whether the defendants considered themselves as partners." *Eastman* v. *Clark*, 53 N. H. 311. Now, I ask the court to place alongside of this definition the following statement of facts made by the referee: "The stockholders and the committee all believed that there was no partnership, and no personal responsibility, at the commencement of the business; and until 1878 they all thought that they risked only their stock. As each one sold out his stock, he and all others concerned thought that he was relieved from all connection with the store, or from all further liability, although nothing was said or done about it." Will some ingenious logician inform us how the plaintiff and the defendants, with such a thought (common to all of them) in their minds, could have considered themselves as partners?

3. But assume that they were partners, the question of agency still remains. What authority had the plaintiff to bind the defendants by signing a note? The referee finds that "it was talked in the grange, and in the meetings at Farnum's, that the committee was to buy and sell for cash." It is true that he also finds that the defendants understood "that money was borrowed to buy with." Suppose they did so understand: it does not follow that they also understood that the lender would look to them for security. The contrary would be the legal presumption,—that the lender would look alone to those who signed the paper which was the evidence of the loan.

4. But there is one point in this defence that I regard as perfectly decisive, and which can hardly be said to be in dispute. Whether the plaintiff and the defendants were or were not partners in the beginning, they certainly were not in the end. If they had been partners, they ceased to be partners long before this suit was brought. I refer to the paying back to the defendants the money and interest which they had contributed to start the store in Francestown. Upon this point the referee finds, substantially, the facts as set forth in the answers. The decisive fact stands out prominently, that the plaintiff and his associates, Savage and Woodward, treated the defendants as creditors and not as partners. It is too late for the plaintiff to shift his ground and treat them as partners. He should not be permitted to blow hot and blow cold, according to the suggestion of his own interest.

Here, let a very obvious supposition be made. After the committee had settled with the defendants, and paid them back their money and interest, and all the parties concerned had come to the conclusion that each stockholder, by receiving his money and interest, "was relieved from all connection with the stores"—suppose that the business had been profitable : will anybody be bold enough to contend that these defendants could have maintained a bill in equity for the division of the profits? If they could not, there was no partnership after the settlement. The partnership certainly was not unilateral. It could not have been a partnership in the losses for the benefit of the plaintiff, without being a partnership in the gains for the benefit of the defendants. As bearing upon this point, let the court consider the very important entries in the plaintiff's books. Jesse P. Woodbury, Manahan, and Campbell sold out their stock to Farnum, Woodbury, and Savage, before the sale of the store, Nov. 7, 1876. What entries were made upon the plaintiff's books as evidence of the nature of these sales of stock from Woodbury, Manahan, and Campbell? On the stock book it appeared that the stock was transferred to Farnum, Woodward, and Savage. There is no suggestion in the entries that these gentlemen were acting as the agents of anybody else, and the entries in the journal and ledger show beyond dispute that they understood that they were acting for themselves. The stock was charged to each in equal proportions. In other words, they bought this stock, and had the entries so made upon their books that the stock appeared to be and was their individual property. How did they pay for it? They paid for it in part, at least, in goods from the store. They now say that these defendants were part owners of the goods that went to pay for the stock. If that claim is well founded, then the plaintiff and Savage and Woodward were guilty of embezzlement. They simply took our goods to pay for their stock. G. L., *p.* 518, *s.* 8. The entries show their understanding in regard to the stock, and it is as clear as the sun at noonday that they understood, also, that the goods that paid for the stock belonged to them ; and they really were not guilty of the crime which they now say they committed.

5. Again : if Farnum, Savage, and Woodward were the agents of the defendants " in the purchase and sale of groceries" (we quote from the bill) in Francestown, by virtue of what authority did Farnum and Woodward sell out to Savage on Nov. 7, 1876 ? Is it not too plain for argument, that the sale on Nov. 7 was made in utter disregard of the authority which the plaintiff now sets up in his bill? Does an authority to " conduct and manage" (see the bill) a business, which consists of buying and selling groceries, carry with it an authority to sell out the stock in trade and the good-will of the business, and wind up the concern without consultation with the principal? A more monstrous proposition can hardly be imagined ; and we are at a loss to understand why the

plaintiff should allege in his bill that after Nov. 7, 1876, "we ceased to carry on and prosecute the business"! Why so? If Savage, Woodward, and Farnum were our agents before the sale, and acted within the limits of their authority in making the sale, why was not Savage as much our agent?

6. We would suggest, that in a court of equity no principle is better settled than that the *laches* of the plaintiff must stand in the way of relief. Now, if the plaintiff was acting for others, whom he took no pains to consult, was it not gross imprudence to turn the whole stock of goods over to Savage without taking any security, and still grosser imprudence, if possible, to allow Savage to go along from month to month, up to the time of the failure, without saying a word to the defendants, or taking a single step to secure the claim which the plaintiff now calls upon the defendants to help pay?

I have cited the case of *Eastman* v. *Clark* as sufficient authority for the proper disposition of this cause. That case was very carefully considered, and most of the authorities, early and late, were thoroughly examined. I have spoken of Manahan as one of the stockholders, for the sake of brevity in the argument. The court will see that he was not a stockholder, and that there is not the least shadow of a claim against him. Dodge stands in about the same position. His name is not on the stock book; neither are the names of E. W. Colburn and G. A. Duncklee. They seem never to have been regarded by anybody as stockholders till this suit was brought.

*Burns* and *G. Y. Sawyer*, for the plaintiff. In the spring of 1875, the plaintiff and fifteen others executed an agreement in writing on the subject of establishing a grocery store in Francestown. The agreement is contained in the subscription paper set forth in the case, signed by the sixteen parties. By it they agree, in substance, each to advance a certain sum as capital to be used in establishing the store, and further agree that the parties so signing shall decide upon its location, and shall make all other necessary arrangements in respect to operating the store. In pursuance of this agreement, they purchased $1,500 worth of the stock of goods of a Mr. Bradford, obtained possession of his store, at a rent agreed upon, in which to carry on the business, virtually appointed, by recognizing and acquiescing in the action of, a committee consisting of three of their own number to take charge of the business, and in April, 1875, having added to their stock by the purchase of other goods in Boston, launched the enterprise by opening the store for trade with the public, and continued the business, with some changes of proprietorship among them, until November, 1876, when one of their number became the sole proprietor of the concern by purchasing from the others their several interests in it.

Prior to the making of this contract, there had been much discussion among the members of an association called the "Oak Hill Grange" upon the subject of establishing such a store. Opinions had been expressed upon various points in connection with such a business, as to the amount of capital required, the mode of conducting the business, and the liabilities of those embarking in the enterprise, etc., but none of these proceedings can modify the effect or qualify the terms of the written contract. Its construction and meaning are plain, that the parties who execute it will associate in the joint enterprise of establishing and carrying on the business of a grocery store, to be located where they may determine, and to be carried on under such arrangements as they may make therefor; and to that end they will advance each a designated sum as capital for that purpose. Until the execution of this contract, the subject of establishing the store was exclusively in the hands of the grange, as a matter for their associate action. It was much agitated and discussed in their meetings. Conflicting opinions were entertained and expressed as to the place where the store should be kept, whether at Bradford's store or Farnum's cottage. The question of how personal liability could be avoided was discussed, and the merits or demerits of the "coöperative" and "protective union" systems considered; but nothing definite was decided upon in the grange leading to the practical result of establishing the store.

While the matter was in this state of uncertainty and doubt in the grange as the subject of their associate action, the subscription paper was introduced, in its terms proposing to withdraw the subject from the control or action of the grange, stipulating that the location should be determined by the subscribers to the capital, and that all other arrangements for operating the store should be left entirely to them. Under this arrangement, the store was established upon a different footing from that contemplated in the starting it as the store of the grange. Who are the proprietors of this store, if not the parties who subscribed to the contract? Who but they are the principals in carrying on the business of the store, so long as they retain their interest in it? They recognized the committee as their agents in the business, and submitted to them the control and management of the store, which they had agreed in writing to advance the capital for, and had also agreed in the same writing to make all arrangements for operating. Several meetings of the parties were held for making the necessary arrangements. At one of them Bradford was present, and a bargain was negotiated and concluded for the purchase of a portion of his stock and the lease of his store. Here the partners decided for themselves the location of the store. And it is clear that it was not "arranged" that they should purchase for cash, whatever may have been said on that subject at the meetings of the grange or elsewhere, for this, their first purchase, was on credit, and after-

wards paid for with money procured on some of the notes here in question. But the further "arrangement" was made, by the common consent and acquiescence of all, that the committee, consisting of three of the largest proprietors, should take charge of the goods so purchased, and of the store and its business. For whom were they acting but for themselves and their co-proprietors, principals, and partners? And for whom were they acting but for the same proprietors, principals, and partners, in subsequently procuring the money on their individual notes with which to pay for these goods? And a further arrangement was made, by the assent and acquiescence of all, that the capital which they had agreed to advance should be paid into the hands of the committee, and used by them in the purchase of additional stock for the store. This money constituted the joint fund of the partners, who advanced it under their contract; and here, again, it may be asked, For whom did the committee act, but for themselves and their associates as partners, in thus disposing of the fund according to their contract?

In this connection, it may be a pertinent inquiry, To whom would the net profits of the store have belonged, if such had accrued, and the business had been brought to a close by common consent before any change had taken place in the proprietorship of the shares? Suppose, when the first change in the ownership of the shares took place by the sale of Simpson's share to Savage, September 7, 1875, that instead of that sale all the parties had agreed to wind up the concern, pay all debts, and distribute the surplus: can there be any doubt that this court would have decreed, on a, bill in equity, that the surplus should be distributed among the subscribers to the capital? It surely would not have belonged to the committee, nor to the grange. And if such winding up and distribution had taken place at any subsequent time, would not the surplus have belonged to the parties who then held the shares,—those who had purchased the shares of others taking their rights by the transfer?

There was no such common understanding among the parties, in reference to their relations to the store and its business and to each other, as to control the terms of their written agreement, and the implications of law arising upon it. What they thought upon the subject is immaterial. Simpson, it seems, thought the store was started by the grange; J. P. Woodbury thought his services in the store were rendered to the subscribers to the stock; and generally it was understood there was no partnership. Yet all understood and acquiesced in the view that the committee were to conduct the business at their discretion, for whom it might concern. Necessary funds were procured by them for carrying on the enterprise which the subscribers had launched, and had agreed to arrange for its operation, and were used in good faith by them in its operation; and upon every principle of equity, the liability for

those funds should be distributed among them in just proportions. The question is, not whether the notes now outstanding, given by the committee for this money, are to be enforced as the notes of the subscribers to the stock, but whether the money procured by the committee upon the notes, and applied to the business of the store, shall be charged upon all those in whose business it was used.

There is no ambiguity in the instrument signed by the sixteen parties. Its provisions are plain, and they need not resort to extrinsic circumstances to give them their just interpretation, beyond the subsequent conduct of the parties under the agreement. By signing it, they became partners in the enterprise,—partners *inter se*, as well as partners to all the world with whom they might deal in the prosecution of the business. It is immaterial whether they understood or not the full extent of the liabilities incurred. They may have supposed that they incurred no risk beyond that of the loss of the money advanced. They may not have thought of the possibility of debts and liabilities to be incurred. Indeed, the case finds that the stockholders all believed, at the commencement of the business and during the time the store was kept, that the business would be and was so managed as to pay all debts, and had confidence in its success. Some of them signed without thinking of the question of partnership or liability. If thought of, they may have supposed, from opinions expressed in the meetings of the grange or elsewhere, that they could not be made to contribute towards the liabilities. All this is immaterial; for their want of understanding, or their misunderstanding, of the meaning, force, and effect of the written agreement into which they entered cannot be put in proof to modify or vary the unambiguous terms, or the legal force and effect, of their written contract.

When either of the stockholders sold out and transferred his shares to another, he thereby ceased to be a partner, and he had no interest in the subsequent business of the concern. The other partner purchasing the shares would, from that time, be so much more largely interested in the concern, and would succeed to the rights and liabilities which thereafter attached to his additional stock. But merely by such sale and transfer, the former partner and owner would not relieve himself from the liabilities incurred while he was a partner and owner. As between him and his copartners, the liabilities of the concern would be adjusted as if the copartnership had been wound up and its affairs adjusted at the time of the sale and transfer, as equity required between them. When Simpson sold and transferred his stock to Savage, November 7, 1875, he undoubtedly ceased to be a partner; but if he was a copartner down to that time, he sold and transferred nothing to Savage but his share of the surplus of the partnership property, that is, its net profits after all debts and liabilities were paid. But if at that time there were liabilities for which the partners down

to that time must contribute from their private funds, there was no surplus to transfer, and Simpson's undertaking in form to sell and transfer such surplus could not relieve him from liability to contribute with his copartners to the payment of the debts contracted during his copartnership, or to the equitable adjustment of the copartnership affairs among the partners.

And so of the other successive transfers of stock. If those made prior to November 7, 1876, are to be held as transfers to the committee personally, then so much is their interest enlarged. If, however, they were bought by the committee on account of the concern, then the number of shares was reduced by the number so bought and extinguished; and the remaining stockholders would thereby have become the proprietors of the entire concern. We claim that the transfers of J. P. Woodbury, Campbell, and Manahan—if he is to be considered a stockholder—were bought by the committee for the remaining proprietors and partners. They were paid for out of the property of the concern, and, however erroneously the transaction may have been entered by the clerk upon his books, the entire property of the concern, November 7, 1876, when the sale was made by Farnum and Woodward to Savage, was vested in Farnum, Patch, Savage, the three Duncklees, Woodward, Lord, J. Woodbury, Balch, Danforth, Colburn, and Lincoln, and in proportions according to their shares, the proportions of Farnum, Savage, and Woodward being more or less, according as the shares of J. P. Woodbury and Campbell were bought on their own account, or bought for the partners generally. That Manahan was supposed to be a stockholder is clear. His name appears as a subscriber for shares on the subscription paper, and on the stock book as proprietor of two shares. But upon the facts reported in the case, we admit that neither he nor Dodge can be held as a subscriber to that paper.

At the time of the sale from Farnum and Woodward to Savage, they were, upon any view, the largest proprietors. They, acting in behalf of themselves and the other partners, agreed that Savage might have the entire stock and assets of the store, upon assuming all its liabilities and paying to them and to each of the other then proprietors the amount of their respective stock and interest; but with the distinct understanding that the other stockholders had the right to decline to sell on these terms, and to retain their stock if they pleased. So far as they assumed to act for the others in this negotiation, it was simply voluntary, to secure to the others as favorable terms for the sale of their stock as they stipulated for themselves. All well understood that the others had the right to decline to sell, on those or any other proposed terms, at their pleasure. It was not, therefore, a sale by Farnum and Woodward to Savage of property or rights which they claimed the right or power to sell as their own beyond the amount of their stock, but a bargain for their own stock, with the understanding that the others owning

stock would probably sell on the same terms, but which, or any other terms, they had the right to reject. It turned out that all accepted, and Savage became the sole owner of the stock and property of the concern.

At the time of this sale Savage was in good standing and credit financially, generally reported to be a man of means and in easy circumstances. But whether this were so or not, what duty rested on Farnum and Woodward, in negotiating their sale to Savage, of demanding security for the benefit of others which they were content to waive for themselves? Each of the other partners, in negotiating the sale of his shares to Savage, or to any other person, could have exacted security against liabilities if he pleased. At the time Savage bought out Farnum and Woodward, he was the largest proprietor among the partners. He was in possession of the stock of goods, as the active managing partner, having the control and superintendence of the store and its affairs. The trade with Farnum and Woodward gave him no new rights or powers over the partnership property or concerns. It merely added to his interest in the concern the shares of Farnum and Woodward, leaving him and Lincoln to manage the business as the active partners, as before. The rights of the other partners, and their remedies at law or in equity, were unaffected by the sale. Nothing could be done by Farnum to compel Savage to fulfil his agreement to pay off the liabilities, which was not equally at the command of every other partner. He was keeping down the interest on the notes, and from time to time promised to arrange for their payment. It surely would have been an unwise policy in any of the partners to have resorted to compulsory measures against him while the bankrupt laws were in force, so long as hope remained that he would be able to fulfil his engagement; and if in the end his bankruptcy became inevitable, the case is one of thousands of the like kind, where, through depression of business and shrinkage of values in 1877 and 1878, men of business in all departments, of apparent means and in good credit, were suddenly reduced to insolvency.

Farnum and Woodward, therefore, were guilty of no laches in the sale to Savage. They made no sale to him except of their own shares of stock, and so far as they negotiated in respect to the sale of any interest beyond that, it was upon the distinct understanding that the other partners were to be at liberty to reject the terms proposed in respect to their shares, and remain jointly interested in the store with Savage, or to accept them and retire from the partnership. And at the time of the sale Savage was in good credit, having apparently abundant means to fulfil his agreement. Nor were they guilty of laches subsequently. If there were any remedy at law or in equity by which they or either of them could have enforced the agreement of Savage, it was equally open to the other partners. There was no reason for resorting to legal proceedings while his credit remained good; and when his failure sud-

denly came, the existence of the bankrupt law rendered such resort of no avail.

At the June term, 1880, the court decided that the plaintiff, and all the other stockholders, were partners originally, and are liable to share the losses of the firm, unless the plaintiff bought the shares of some of his copartners, and assumed their shares of the debts, or agreed to look to Savage alone for indemnity. On the question whether any of his copartners had thus been discharged by the plaintiff from their original liability, the report was recommitted for further facts.

### REFEREE'S SECOND REPORT.

The referee, having heard further testimony and arguments of counsel, reports,—

The vendees of stock or shares did not assume the vendor's portion of debts or losses. No one when he sold his stock understood that the vendee assumed any liability for debts or losses. Simpson sold his stock to Savage, Sept. 7, 1875. The stock or shares of Jesse P. Woodbury, Manahan, Campbell, and Lord were sold to the association, and not to individual members of it, at the dates named in the former report. The sale was so understood by the parties. When each sold his stock to Savage, the vendor did not understand that if he was compelled to pay debts he was accepting a remedy against Savage alone in lieu of a remedy against all others. The vendor and vendee had no thought or understanding about liability, because each thought the business would be a success, and there would be nothing to pay. When Savage bought the goods in November, 1876, he understood that he assumed all existing debts, but there was not any understanding by Savage or any vendor that a remedy against Savage alone was accepted in lieu of a remedy against the other parties. At each sale of shares, November 7, 1876, and after, to Savage, it was understood that Savage would pay all existing debts. When Savage bought, in November, 1876, and after, there was not any understanding that those liable for existing debts were to look to him alone for contribution: there was not any understanding or thought about contribution.

In answer to requests of counsel, the referee reports,—

All parties understood at the commencement of the enterprise, and during the progress of the business, that goods were bought, or that money was hired to buy goods, on the credit of the association. Farnum when he sold to Savage did not agree to take him as paymaster, and to discharge all the rest. No one of the vendees released his associates. There was no understanding by Farnum when he sold to Savage that he should look to Savage alone. Farnum, like all the rest, regarded the business as an association; that all were interested according to their several shares of stock. Every one had such confidence in the success of the business that

no one thought of his individual liability as a partner. W. H. Lincoln, the book-keeper, after the first month to the time of the sale to Savage, who is living in Lowell, Mass., did not testify before the referee at any time. Farnum paid $5,756.71, May 20, 1879, and this is the whole loss of the association.

*Burns* and *Sawyer & Sawyer, Jr.*, for the plaintiff. In his second report the referee finds that there was no agreement or understanding on the part of any one, when he sold his interest to another, that the latter assumed the vendor's share of existing debts and losses. The plaintiff, " when he sold to Savage, did not agree to take him as paymaster, and to discharge all the rest," and there was no understanding he should look to Savage alone. " No one of the vendees released his associates."

Simpson sold his stock to Savage, but the others, to wit, Woodbury, Campbell, and Lord, all sold to the association, and not to individual members of it, and it was so understood. This includes all the stock that was sold until the general sale to Savage, Nov. 7, 1876. At that time all sold their stock to Savage, he " to pay all existing debts."

This disposes of all the questions submitted by the court; but the referee, at the request of counsel, finds, upon a further and full hearing upon the point, as he substantially found in his first report, that "All parties understood at the commencement of the enterprise, and during the progress of the business, that goods were bought on the credit of the association;" and, further, the referee says, " Farnum, like all the rest, regarded the business as an association; that all were interested according to their several shares of stock."

This second report removes all the objections raised by the defendants to holding them responsible to the plaintiff as copartners. The referee, in this last report, says they all understood, not only at the beginning but during the progress of the business, that goods were bought or money hired on the credit of the association; and that not only Farnum but all the rest regarded the business as an association in which all were interested according to their stock. No ground is now left upon which the defendants can argue they did not intend to be associated together. They were associated together: the case finds it: they knew it, and they signed an agreement to that effect. They bought goods on credit themselves at the meeting at Farnum's hotel. They acted as an association when they closed the bargain with Bradford, purchasing of him fifteen hundred dollars' worth of goods on credit. They raised a committee by their own acts,—Farnum, Savage, and Woodward. They authorized them to act. They instructed them where to locate the store. They put their money into the hands of this committee, called them a committee, knew they were hiring money and buying goods on the credit of the association. When the

committee sold out the property of the association to Savage, Nov. 7, 1876, all the defendants who had paid for stock, and had not before sold their stock to the association, knew of the sale, and ratified it to all intents and purposes by transferring their individual stock to Savage for principal and interest, or profit. It is idle now to contend that the committee had no right to make this sale. They made it with the knowledge of the stockholders and without objection, and they are now estopped to deny the authority of the committee to make it.

If these parties formed and constituted an association, as the agreement shows and the case finds, and employed this committee, did business on credit, knowing it all the while, as they did, then they were partners *inter se*, and they must be held liable for contributions to the plaintiff. Even if it was purely a question of intent,— if the question was, Did the parties consider themselves partners?— there could be but one answer, and that an affirmative one. The simple saying now, after the losses have been incurred, that they did not consider themselves partners, or liable for the losses of the enterprise, amounts to nothing. Of course, at the end of the performance, and in the presence of their disaster, they do not consider themselves liable. It would be very strange if they did. What do the facts show? What do their acts show? What does the documentary evidence prove? The facts, acts, and writings all show that they were partners, and considered themselves such. But suppose the writing signed by them had contained a stipulation that they should not be partners: we submit that their acts and conduct have been such, in reference to each other and to the business, as to estop their denial of responsibility.

The agreement need not contain the word "partnership" or "partner." The parties may not have supposed at the time they were forming a partnership. They may have thought nothing about it. But they undertook to do something. They undertook to do it together. They proposed and agreed to start and operate a store together. If not as partners, pray how? Who, if not they, were to be responsible for the debts which they incurred? They must have known somebody was creating obligations and making debts for goods which somebody must meet. Who was that somebody? Not the committee, for they had no more interest in the operation than the rest of the signers of the agreement. Clearly, the members of this association and nobody else. The parties who, in spite of any intent they may have had, by their acts voluntarily associated themselves together, became thereby partners *inter se*, and are responsible for the losses which they have suffered and caused.

Dodge never having signed the agreement, paid for any stock, or received anything back from the association, cannot be held as a partner. But Manahan, Colburn, and G. A. Duncklee do not stand in the same way. Manahan, although he did not sign the

agreement, nor authorize any one to sign for him, did take the stock, paid for it, his name appears upon the stock book, and he sold his stock to the association and received principal and interest. The referee finds that it was a gift to the association in the first instance, but the referee also finds that he received it back with profit. It therefore appears that the association regarded him as one of its number, it treated him precisely as it did the rest, and somebody, it does not appear who, did sign his name to the agreement. Manahan should be judged by what he did in the matter. His associates regarded him as one of the association. They conducted toward him, and he conducted toward them, as if he was one of their number. He paid in his stock; he was recorded as a stockholder; and he sold out with the rest. The association offered him fifty dollars and interest, and he took it. We submit that if, as appears, he originally intended it as a gift to the association, but his associates did not so understand it, and he afterwards treated it as stock in the association, and sold it to them, making no claim that it was a gift, he cannot now claim immunity from liability under the shelter of calling it a gift. It was not treated either by Manahan or his associates as a gift after it had been paid in, and whatever his original declaration or intent may have been, his subsequent conduct involves him with others in this responsibility.

Colburn and G. A. Duncklee signed the agreement, but did not pay for their stock. Why should they be released from contribution to the plaintiff? By signing the agreement they became members of the association. They entered into this undertaking in writing with the others, and the mere fact that they did not pay the amount subscribed cannot save them. Their associates understood that they, with the other signers, were members of the association. The agreement signed by them is the basis of the partnership. Colburn and Duncklee were never released by the rest. They knew about the business as the others did. They are bound by the same knowledge of goods being bought on the credit of the association. "Farnum, like all the rest, regarded the business as an association that all were interested in, according to their several shares of stock," is the language of the referee. Colburn and Duncklee then knew this. They regarded it as an association. All so regarded it. They knew they were subscribers, and therefore stockholders, owing the association for their stock, as they had not paid for it, and liable for it whenever called on to pay it. They were not called on to pay, and did not pay. The inference is, they were ready to pay when invited. They both participated in some of the meetings at Farnum's. "There were three or more informal meetings of the parties to this writing at Farnum's hotel. They were not all present at any one meeting; but all, except Mrs. Balch, were present at some one or more of the meetings." Manahan, Colburn, and G. A. Duncklee were each present at

" some one or more of the meetings" held at Farnum's, when and where this association had its birth. Each had a hand in its formation, and two of them signed the agreement that formed it. They should be held as partners with the rest, and made to contribute their proper shares toward the losses incurred in the undertaking. They ought not to be allowed to help start and run this concern, permit their associates to be deluded into the belief that they were acting for the whole, and retire without liability, as soon as it suits their convenience.

The association has met with a loss of more than six thousand dollars, including interest. The plaintiff, by reason of signing certain notes, the proceeds of which went to buy goods for the association, is obliged to bear the whole loss; and he brings this bill to compel his copartners to contribute their just proportion.

*Rand*, for the defendants. I. The plaintiff seems to think the word "association," in the second report, means the stockholders sued in this case. We think, on the contrary, that it must mean the grange. In the second report the referee says, "All parties understood, at the commencement of the enterprise, and during the progress of the business, that goods were bought, or that money was hired to buy goods, on the credit of the association." In the first report he says, in speaking of Simpson, "He understood, or thought, that the grange started the store, and was responsible for everything; and that the stockholders advanced the money to the grange to buy goods." The reports must be construed together, if they can be. Simpson certainly did not understand that goods were bought, or that money was hired to buy goods, on the credit of the stockholders. If he thought like all the rest, he and all the rest must have thought that goods were bought on the credit of the grange. In the first report the referee says, "Those who signed to take stock, in their own minds thought that the only difference between them, in their relation to the store and other members of the grange, was, that the stockholders contributed stock and others did not." The conclusion is inevitable, that if goods were bought on anybody's credit except that of the buyers, they must have been bought on the credit of the grange, in the estimation of the stockholders. In the first report, it is said, " Farnum, Woodward, and Savage, after they were appointed a committee by the grange, in the negotiations for the store, buying the goods of Bradford, and starting the business of the store, and in running the store, thought they were acting as such committee." How could these three stockholders have thought that they were buying goods on the credit of the "association," unless the association and the grange are one and the same thing?

If they are one and the same thing, the bill must be dismissed. It is hopelessly wrong, beyond the power of amendment. Its leading idea is a mistake. If these defendants are called upon to show

cause why they should not be made liable, because they signed a subscription-paper and paid money to start a grocery store, their defence must, of course, be prepared to meet that claim. But if they are expected in this suit to show cause why they should not be made liable, because they " with many others " were members of a certain grange, their defence is very plain and conclusive. They have not yet received any notice of such claim. They will not be preparad to defend themselves against that claim till the claim shall be made by proper pleadings.

We submit that we have now shown that certain facts found in the first report cannot be reconciled with certain other facts in the second report, without assuming that the words " association " and " grange" are identical in meaning.

II. In all particulars in which it can be shown that the two reports are contradictory, the first report is the only one upon which the court can act. The reason for this is obvious. The case was sent back to the referee to enable him to find further facts, deemed necessary for a proper decision of the law. He was not to have a rehearing upon facts already found. The parties could not have supposed that such facts were in issue at all; and could not have supposed that they would be called upon to litigate further in regard to them. We think this is too plain to require further argument. What, then, are some of the material facts found in the first report, and contradicted by the findings in the second report? The first report says, "As each one sold out his stock, he, and all others concerned, thought that he was relieved from all connection with [the] store, or from all further liability." Now what is the meaning of those words? We invite the careful attention of the court to them.

1. All the parties concerned thought that such was the trade which they made. 2. All the parties concerned understood that such was the trade which they made. 3. All the parties concerned agreed that such was the trade which they made. Do those three propositions differ at all in their legal import? The question is, What, in reality, was the trade? What did the vendor sell? What did the vendee buy? What did the vendor think he sold? What did the vendee think he bought? Did they both think alike? We submit that the first report finds, in the clearest possible language, that the vendor and vendee agreed exactly as to what was bought and sold; and that they both thought—understood—that the trade worked a complete dissolution of the vendor's connection with the store, completely extinguished all right he might have had to its profits, and all liability which, up to that time, he might have been subject to for its losses. In the second report, it is said, " No one, when he sold his stock, understood that the vendee assumed any liability for debts or losses." Can the two statements be reconciled by the supposition, that, although both parties understood there was to be no " further liability " of the vendor, they also

understood that no additional liability was to be assumed by the
vendee? It is plain that the statements cannot be made to har-
monize in any other way; and, interpreted in that way, the state-
ment in the second report becomes entirely immaterial. It is
enough to know that the vendor was relieved from "further lia-
bility."

III. In the second report it is said, "The stock or shares of
Jesse P. Woodbury, Manahan, Campbell, and Lord were sold to
the association, and not to individual members of it, at the dates
named in the former report. The sale was so understood by the
parties." This statement is contradicted by the first report, what-
ever may be the signification of the word "association." In the
first report the referee says, "Lord's stock was transferred to
Farnum, Woodward, and Savage, June 23, 1876." It may be pos-
sible, perhaps, to split hairs upon the different meanings that may
be attributed to the words "transferred" and "sold;" but we sub-
mit that the referee meant simply to say that Lord's interest was
transferred to Farnum, Woodward, and Savage, individually.

The entries in the store-books are facts themselves, and reported
as such by the referee, and intended by him to be understood as
such; and they are the most reliable of all the facts in the case.
The "books of account" were kept in the name of the "Frances-
town Grange Store." The theory of the plaintiff's case is, that the
Francestown Grange Store was not Farnum, Woodward, and Sav-
age, at any time from the commencement of the business down to
the time of the failure of Savage. The books were the books of
the Francestown Grange Store. On those books all the stock-
holders had private accounts. The plaintiff had his with the rest.
Jesse P. Woodbury agreed to step out of the concern, take his one
hundred dollars that he put in, and five dollars simple interest.
"He was paid in money and goods from the store." If the books
were properly kept by double entry, his account would stand as
follows:

Jesse P. Woodbury, Dr., to sundries,              $105.00
   To merchandise (amount of goods bought),
   To cash (balance up to $105—stock and int.),              $105.00

How was his account balanced? In this way,—

Sundries, Dr., to Jesse P. Woodbury,                        $105.00
   Wm. H. Farnum, ⅓ of Jesse P. Woodbury's
     stock,                                        $35.00
   A. L. Savage,    "     "              35.00
   A. B. Woodward,   "     "              35.00

These entries would close up the account of Jesse P. Woodbury,
and leave Farnum, Savage, and Woodward charged one third each
with the amount of the Woodbury stock and interest. On the

stock book was made the following entry : "December 30, 1875, transferred and assigned to A. L. Savage, Wm. H. Farnum, and A. B. Woodward." And we are told in the second report that this Woodbury stock was sold to the "association" ! Such an idea is simply bewildering. Suppose that Savage, Farnum, and Woodward settled up their accounts with the "Francestown Grange Store" within a reasonable time after December 30, 1875 (and the presumption is that they did), who, then, would own the Jesse P. Woodbury stock ? They were charged with it. Suppose they paid in some way the $35 each : would the stock belong to the association ? If so, we ought speedily to be instructed in some new system of book-keeping. Indeed, the first report finds that Farnum and Woodward did pay for this Woodbury stock. "Farnum and Woodward were credited in their account on the ledger with the amount of stock in their names; and the same amounts were charged to Savage on his account. The same books were kept by Savage after November 7 as before." According to the second report, Savage bought this stock of the "association;" and Farnum and Woodward got credit for it on their individual accounts upon the books of the association. They certainly had a queer way of keeping accounts in that association, under the administration of the plaintiff, Woodward, and Savage. The foregoing argument could be repeated with equal force to prove that the stock of Manahan, Campbell, and Lord was transferred to Farnum, Woodward, and Savage, as individuals, and sold by them to Savage. When they bought it, it was charged to them individually : when they sold it, it was credited to them individually. The first report presents these facts in a very clear and satisfactory manner, and the second report simply contradicts them; and the first report should prevail, for reasons already stated.

IV. But suppose the reported entries are not a sufficient statement of the facts. We then say that they are sufficient to create an estoppel against this plaintiff. They are entries made in the books of a store under his management. They are in law his own entries. He ought not to be heard to say that they are false. The presumption is (and it is true as a matter of fact, too) that when this suit was brought, the defendants searched the books to ascertain what they should do about making a defence. They relied upon the entries in the books of the plaintiff, and shaped their defence accordingly. (See the answers of the defendants.)

V. Were any of the defendants partners originally ? The question concerns a partnership *inter sese.* The plaintiff calls on the defendants to contribute, because they were his partners, as he avers. The most pertinent question that can possibly be asked, then, at the opening of the argument, is this: What is a partnership *inter sese?* What does the law say it is ? It is purely a legal term, and it is about as familiar to the bench and bar as any word in the language; and it is a matter of very great importance to the

profession, and to the public who apply to the profession for advice, that a definition given to such a word in one decision should not be contradicted by the definition given in the next decision. We turn, then, to the case of *Eastman* v. *Clark*, 53 N. H. 307. The court is commenting upon the case of *Grace* v. *Smith*. "The plaintiff's claim was, that the defendant and Robinson were partners *inter sese*, though their partnership relation was not disclosed. The defendant was liable to the plaintiff, if he was in fact a copartner of Robinson, as between Robinson and himself: if he was not such a copartner, he was not liable. If he was to receive something from Robinson in 'payment' of a debt, he was a creditor: if he was 'to share the profits of the trade with Robinson,' not in 'payment' of a debt, he was a partner. Whether he was a creditor or partner depended upon their agreement, that is, their understanding. If they understood he was a creditor, he was a creditor: if they understood he was a partner, he was a partner." Again (*p.* 311): "'A partnership is a joint understanding to share in the profit and loss.' If there is no estoppel, the question is whether the defendants ' considered themselves as partners.'" This is all very clear. We cannot help thinking that we understand it. We turn, then, to the first report, and we find the following: " The stockholders and the committee all believed that there was no partnership and no personal responsibility at the commencement of the business, and until 1878. They all thought that they risked only their stock." Now, it is completely beyond the reach of our comprehension to understand how the court can say that there was a partnership *inter sese* in this case without squarely overruling the doctrine of *Eastman* v. *Clark*. Of course it is a mere puerile refinement to attempt to draw any distinction between what they all believed, and what they all thought, and what they all understood.

It is not only true that the plaintiff and all the defendants understood that there was no partnership from the beginning, but it is also true that that which is of the very essence of a partnership, according to all the authorities, is completely lacking in this case,—a community of interest in the profits. Bouvier says (Law Dict. 291), "Although the usual characteristics of an ordinary partnership are a community of interest in profits and losses, a community of interest in the capital to be employed, and a community of power in the management of the business to be engaged in, still, perhaps, nothing can be said to be absolutely essential to a partnership except a community of interest in the profits." Story Part., ss. 18, 27, and note; *Dob* v. *Halsey*, 16 Johns. 34; *Rawlinson* v. *Clarke*, 15 Mee. & W. 292; 1 Pars. Cont. 125; *Ambler* v. *Bradley*, 6 Vt. 119; *Blanchard* v. *Coolidge*, 22 Pick. 151; *Denny* v. *Cabot*, 6 Met. 82; *Ex parte Watson*, 19 Ves., Jr., 459; *Ex parte Richardson*, 1 Rose 92.

In this case the defendants never received any profits, never

askcd for any profits, and never understood that they were entitled to any.    Nothing is said about any profits or any partnership in the subscription paper.    They did not contribute their money with any expectation of profits.    On the contrary, they contributed their money simply "for the purpose of starting a grocery store;" and the first report finds that their idea was "that the prices of goods, such as are usually kept in a country store, would be lessened."    And when "an account" was taken, in April, 1876, and established the fact that the profits amounted to $459.71, the plaintiff did not offer to divide; he did not even let the defendants know that there were any profits.    On the contrary, he and his associates continued their work, which had already been commenced, of getting all the stock into their own hands by paying back to those who had contributed their money to start the concern the amounts they had contributed, with simple interest.    This interest is called profits in the plaintiff's brief.    But to reason in that way is simply to abuse the Queen's English.    Interest is the ordinary badge of a transaction between a creditor and a debtor, not of a transaction between partners.    Creditors take interest; partners take profits.    The truth is, this plaintiff, and his associates Savage and Woodward, conceived the idea at one time that money was to be made in this Francestown Grange Store; and, prompted by that idea, they were anxious to settle with the defendants by paying them their money and interest, and extinguishing their claim, whatever it might be.    In reality, the transaction was not a purchase and sale of stock, although we speak of it in that way for convenience of argument, but it was a paying back to a creditor the money he had contributed to start a certain business from which he expected to derive benefits indirectly, but not any profits as a partner.    And it seems to us, that, regarding the transaction as a sale of stock, the very nature of it shows, beyond all controversy, that all the parties understood that, whatever may have been their rights and duties before, the settlement was final. The vendors had no further claim of any kind, for money, interest, profits, or anything else, and the vendees had no claim on them for any liability.    The concern was solvent; and if the plaintiff had advanced money, the goods were then in the store to represent the money, or the cash was there for which the goods were sold.    How could he have understood that these defendants meant to be responsible to him for misfortunes that might overtake the business subsequent to the time when they parted with their interests?

VI. Let it be conceded, then, for the sake of argument, that there was a partnership at the commencement of the business between the plaintiff and the defendants.    The defendants all sold out their interest to their copartners when the concern was solvent. What, then, was it that was bought and sold?    The plaintiff admits in his brief that each stockholder sold his share of the "net

profits after all debts and liabilities were paid." But does not such a sale necessarily imply that the purchasing partners will look to the property in their hands for the payment of the debts? It certainly implies the solvency of the partnership; otherwise there would be no "net profits after all debts and liabilities were paid." It is well settled law, that each sale works a dissolution of the partnership. If the purchasing partners, instead of winding up the concern, choose to go along with the business, can they do so at the risk of the selling partners? A, B, and C are partners in the grocery business. A has $1,000 in his pocket, and puts it into the business. B borrows $1,000 on his note, and puts that money into the business. C puts in $100. At the end of a year A and B say to C, What will you take for your interest in this concern? C says he will take $200, and the trade is made. A and B go along with the business, and meet with misfortunes. Can A call on C to contribute? Is B in any better condition to do that because he raised his money by note? Can he call on C to help pay the note? We think it is very clear that he cannot. And it would make no difference whether the money was borrowed on the note at the beginning of the partnership or afterwards. Partners cannot in that way transform themselves into creditors without the consent of their copartners to the change of relation.

But it may be claimed that in this case there was a consent. Let us see, then, what the facts are. "The stockholders knew the amount of stock subscribed, and knew, from seeing the quantity of goods in the store, and the amount of business, and the kind of goods after the opening of the store and during the continuance of the business, that goods were bought on credit, or money borrowed to buy goods. The committee knew all the facts. The other stockholders made no inquiries about the facts, and were not informed by the committee or any one. The committee never called any meeting of stockholders after the opening of the store, and no meeting was held; and never consulted or asked any of the stockholders anything about the business of the store, or the borrowing of money, buying or selling on credit, or the selling out in November, 1876." It is perfectly plain from the above quotation that when the referee says the stockholders "knew," he means simply that they inferred from what they saw in the store, or might, or could, or should have inferred. They had no facts to go upon except those just quoted. They made no inquiries, and nobody told them anything. Most likely they were satisfied with the common understanding at the commencement of the business. The committee went out and borrowed money to put into the business, without any express authority, and right in the teeth of the express understanding of all the parties, not excepting themselves, at the commencement of the business. "It was talked in the grange, and in the meetings at Farnum's, that the committee was to buy and sell for cash." In the second report the referee finds that all

understood that money was borrowed on the credit of the "Association." If that means that these defendants understood that money was being borrowed on their credit, and that they were to be personally responsible for it, it is contradicted by the first report.

*Ladd*, for the defendants. The understanding of the parties was the organic law of the association. It was a contract,—a mutual promise of each to all the others,—by which all were bound. The hiring of money by Farnum, Woodward, and Savage, on their own names, was not an act within this mutual compact, but entirely without it. They did not pretend even to hire money on the credit of the concern. They had no right to do so. They were bound by the mutual understanding and contract not to do so; and they were bound by their duty, as managers for their associates in carrying out the understanding upon which the association was established, not to do so. All their acts, from beginning to end, recited in the report, show that they did not dream of doing any such thing. They hired money on their own names, and that they had a right to do. They put that money into the business as an addition to their contribution to the stock; and that was perhaps no infraction of the original understanding and compact.

Two of them sold the goods to the third, November 7, 1876, securing in the sale the rights of the other associates, according to the understanding which every one, down to that time and for a long period afterwards, entertained of the compact by which they were all bound, but, as I now maintain, wantonly violating the rights of those associates, if a compact, which no one of them ever supposed existed, is now to be substituted for the one which the parties made for themselves; for the associates were not consulted as to what was done, or as to what should be done. Nobody was informed that there were debts of the concern to be paid. Nobody understood that such debts existed. The concern was at that time solvent. Nothing was said by anybody about winding up the business. The sale was not made for that purpose, only so far as provision was therein made for extinguishing the interest of all others, at their option, according to the original understanding and contract as to what their interest was. The business was afterwards swamped by the bankruptcy of Savage; and the notes of Farnum, Woodward, and Savage were not paid. That is all there is to it. The only debts outstanding are the individual notes of Farnum, Woodward, and Savage, which, according to the mutual contract by which these people came together, could not, as between the associates, be the debt of the others.

Who owned the goods before the sale to Savage? The title may properly enough be regarded as in those who had furnished the money with which they were bought, as tenants in common, each having an interest according to his contribution to the stock. In case profits had been realized, to whom would the profits be-

long, and how should they be divided? It is competent and lawful for ten men to agree together, each with all the others, that they will put in, each, a certain sum of money, for the carrying on of a given business; that that business shall be so managed and carried on that no gains or net profits shall be made; and to omit wholly, in such contract, to provide for a contingency which they have thus expressly agreed shall not arise, namely, the division of profits. That was just what the parties did in this case. It was agreed that there should be no profits; hence they made no agreement as to how profits should be divided.

But suppose, with such an original contract, at the time of winding up it turns out that profits have been made: what then? Certainly nothing more than this,—that a state of things has arisen not anticipated, and not provided for in the original contract; and all the parties have to do is to determine, by a new and additional contract, what shall be done under the new and unforeseen circumstances. But, suppose the parties cannot agree as to how the profits shall be divided in the supposed contingency, and apply to the court to help them out of the difficulty; and suppose the court, seeing that they were tenants in common of the goods out of which the profits were made, should be of the opinion that an equitable division (out of analogy to the rule in winding up a copartnership) would be to each a share, according to his contribution to the stock: does it follow that in all things they are to be treated as partners *inter sese?* Is not the court bound to enforce the contract which the parties made for themselves,—that is, the understanding upon which all acted,—so far as that contract and understanding go? Can the court substitute a new contract, at variance in every material point from the contract which the parties made for themselves, merely because that contract fails to provide for a contingency which it was originally understood and stipulated should not arise? We respectfully submit that this cannot be done.

But what makes this inquiry immaterial, as it seems to me, is the fact, that, so far as regards profits at least, there is no occasion for going beyond the original contract. There are no profits to be divided. The legal rights of all parties, which are by any possibility involved here, are ascertained and fixed by the understanding and contract of those parties between themselves, without going any further. And we submit that that contract ought not to be overturned by the fact that a contingency might possibly have arisen for which the contract did not provide, and which might, under some conceivable circumstances, have called upon the court to settle the equitable rights of the parties with respect to a matter concerning which their contract is silent.

*Rand,* for the defendants. 1. In answering the question, Who owned the goods before the sale to Savage? it may be good law to

say, Those who furnished the money with which the goods were bought owned them as tenants in common. I make no contention different from that. My point is, that whatever may have been the interest of the defendants in the goods, it was not that of partners,—first, because they all understood and agreed that it should not be that of partners; second, because they all understood and agreed that there should be no community of interest in any anticipated profits. These two things, if *Eastman* v. *Clark* is law, are of the essence of a partnership *inter sese*, and the plaintiff must make out such a partnership, or he cannot recover in this action. It is the sole ground of liability set up in his bill. The court cannot make a new bill any more than a new contract for him. In *Ward* v. *Brigham*, 127 Mass. 24, what was the interest of the defendants in the property purchased?

2. Again, I say, supposing that there was a liability originally as partners, when the defendants sold out, the case finds distinctly that they all understood and agreed that there should be no "further liability" of the vendors.

3. If the above findings of the referee are contradicted by other findings, then I venture to express the hope that the case will not be disposed of upon a collection of contradictory findings.

*Burns* and *G. Y. Sawyer & Sawyer, Jr.*, for the plaintiff. There is no evidence to be found, in either report of the referee, that it was agreed "there should be no profits." But, conceding that it is to be inferred, from any facts or circumstances reported, that it was understood by all of the associates, as a feature in "the organic law of the association," that the business was to be so arranged and conducted that no net profits were to accrue, then we agree that the division of unanticipated net profits, if such should happen, not having been provided for in the original contract, might possibly be held by the court to be a matter for judicial decision upon principles of equity, "out of analogy to the rule in winding up a copartnership" if the parties could not agree among themselves; and this, whether they are found to be technically parties *inter sese*, or merely tenants in common or joint owners. But losses in the business were equally unanticipated: consequently no provision was made in the original contract how such should be borne, if they should unexpectedly happen. In fact, there is stronger ground furnished by the report for holding that it was the understanding of the parties, constituting "the organic law of the association," that there were to be no losses, than for holding that it was their understanding there were to be no profits; for the referee finds, in his first report, that "every stockholder believed, at the commencement of the business and during the time the store was kept, that the business would be and was so managed as to pay all debts;" that "all the stockholders * * had confidence in the success of the enterprise, and that the busi-

ness would pay all expenses;" and, in his second report, that "every one had such confidence in the success of the business that no one thought of his individual liability."

Assuming, then, that it was understood that there were to be no profits, and that consequently no provision was made in the contract of association for the distribution of such, it was equally well understood that there would be no losses; at least no provision was made for them in the contract, and we submit that whatever principles would be applied in distributing the profits, if any had accrued, would be applied in apportioning the losses. If, therefore, in the case of profits accruing, not anticipated nor provided for, the court, seeing that the parties to the contract were joint owners of the goods, and jointly associated in the business of merchandise, in which the goods were employed and out of which the profits grew, should deem it equitable to distribute the profits among the owners of the goods in proportion to the extent of their ownership, and we insist there is no equity in any other view, the same equity requires that losses, equally unanticipated and equally unprovided for, should be apportioned in the same way.

DOE, C. J. By the written agreement, the signers "agree to take the number of shares set against our names, at $25 per share, for the purpose of starting a grocery store,—said stockholders to decide upon the location for said store, and make all other arrangements necessary to carry into operation said store." There being no purpose to organize a corporation, this was an agreement to become unincorporated "stockholders" of "a grocery store." The defendants, Dodge and Manahan, did not sign the agreement, and did not become stockholders. Manahan gave the stockholders $50, which was given back to him; but he was neither a partner nor a creditor. He neither took nor agreed to take any "shares" in the store; he did not hold himself out, nor consent to be held out, as a stockholder; and he has in no way made himself liable for the debts or losses incurred in the business of the store. The defendants, Colburn and G. A. Duncklee, signed the agreement, but did not become stockholders by taking, that is, paying for, the shares they agreed to take; and the facts of an estoppel are not found against them. It does not appear that they induced the plaintiff to believe and act upon the belief that they were stockholders. The case does not raise the question of their liability for damages for their non-performance of their agreement to become stockholders, or the question of their liability to become stockholders on a bill for specific performance of their agreement. This bill for dividing losses among stockholders cannot be maintained against those who have never been stockholders.

The other defendants and the plaintiff became stockholders by performing their agreement "to take the number of shares set against our names, at $25 per share, for the purpose of starting a

grocery store." Whether specific performance of this agreement to become stockholders could have been enforced on a bill in chancery, and whether damages for its nonperformance could have been recovered in a suit at law, are now immaterial questions. Those who became stockholders by voluntarily and specifically performing their agreement to take shares, accepted, as between themselves, the rights conferred and the obligations imposed by the writing, which is the best evidence of their intention and understanding. If the writing did not correctly state the contract they intended to make with each other, it could have been reformed on a bill in equity, or abandoned by common consent. Having been neither changed by legal process, nor rescinded by the parties, it is binding upon them like any other written contract, and cannot be varied by parol.

Those who took the shares they agreed to take considered themselves "stockholders;" they so described themselves in the agreement: and "stockholders," in the agreement, means "partners." They became stockholders, without being incorporated and without any design of forming a corporation, "for the purpose of starting a grocery store," and they carried their purpose into execution. In pursuance of the agreement, they delivered to the plaintiff sums of money equal to the shares set against their names, at $25 per share, to be invested in goods to be bought for the store. The money thus raised was the property of the firm; and the goods bought with the money were the property of the firm. There was no loan or gift of the money, the goods, or the proceeds of the goods. The purpose of starting a grocery store was accomplished in April, 1875. In less than two years all the shares except those of Savage were sold by their owners, and were bought by Savage. And the question is, whether each stockholder is liable to contribute, in proportion to his number of shares, for the payment of debts of the store contracted and losses of the store incurred while he was a stockholder.

The "shares" which, by the written agreement, the "stockholders" were to take, were shares of the stock of which, by the agreement, they were to be holders; and that stock was the capital stock of the store which it was their purpose to start. There was no other stock of which they became holders, in pursuance of the agreement. They were to own shares of undivided property; there was to be a community of interest; and the property which they were to own in common was to be "a grocery store." The store which it was their purpose to start was not a mere building, but a grocery business, including its capital stock, profits, and losses. There would be a balance of profit, or a balance of loss: profits and losses, producing that balance, were certain. Losses (by expense and leakage, if not otherwise) were as inevitable as profits; and the maintenance of an exact and continuous equilibrium of losses and profits was impracticable. In April, 1876, the

books showed $459.71 as a balance of profit. Each cent of profit, when received from a customer, was not to be set aside and kept as a separate fund with a preserved identity. If that course had been taken, the fund of profits, being a part of the price received for goods sold, would have been the fund of the stockholders of the store. The profits were to be mingled with and become a part of the stockholders' capital. The capital stock, owned in common, would be money, goods, fixtures, and implements of the business, and claims for goods sold on credit, if sales on credit were made.

The business in which the capital was to be employed was buying and selling the goods of a grocery store. The stockholders engaged in that mercantile business were to be joint principals carrying on the business. This is the natural and obvious meaning of the written contract of unincorporated "stockholders," taking "shares" "for the purpose of starting a grocery store;" there is no competent evidence giving the contract a different meaning: and such principals are partners. *Eastman* v. *Clark*, 53 N. H. 276, 294. The community of interest in the profits and losses of the business, like the community of interest in the original capital, was an unavoided incident, and an unsevered and unalienated part of the community of interest in the grocery business started by the stockholders, and carried on by nobody else as principal during the time they held their shares of the capital. During that time they were not creditors of the principals by whom the business was carried on. That it was carried on during that time by their debtors as principals, is a fact that has not been and manifestly cannot be found. There were no such debtors; and without debtors there can be no creditors.

The written contract did not provide that anybody but subscribing stockholders should have any interest in the business; and nobody but such stockholders acquired any interest in it, during the time for which contribution is sought. There was no gift or contract by which, during that time, any part of the business, chattels, money, debts, credits, profits, or losses of the store belonged to any one but the stockholders. They carried the original contract into execution without any departure from its legal meaning. They owned their shares from the moment they created stock by taking shares, until they sold them. Until they sold them, the business started by them did not cease to be theirs. No share was sold to any one who was not an original member of the firm. By sales of shares, the number of the partners was diminished; but the business was the business of partners until stockholder Savage became the owner of all the shares. Then, and not till then, and by his purchase of all the shares of his copartners, the partnership was finally dissolved. When a shareholder sold his shares he withdrew from the firm, and did not become liable to contribute for debts afterwards contracted, or losses afterwards incurred; but he was not discharged from his liability to bear, by contribution, his share of

debts contracted and losses incurred while he was a partner.  The "further liability" from which he was relieved was that which would subsequently arise in the continuance of the business of the store, and not that which had already arisen.  For debts contracted by the firm after his retirement he might be liable to creditors *(Zollar* v. *Janvrin,* 47 N. H. 324), but not to his copartners.  Long after the amicable and harmonious dissolution of the firm, the present controversy arose, from the fact that the stockholders did not wind up the business and pay the debts out of the capital stock, and, when they severally sold their shares, did not severally require indemnity from the purchaser against the vendor's liability for existing debts.  And for his own omission each stockholder is alone responsible.

The liability of the subscribing stockholders depends, not upon their opinion of the legal meaning of " partnership," but upon their knowledge and understanding of the facts of their shareholding enterprise, proved by competent evidence.  Their shares were not given away.  No one understood that he was a donor or a donee of any of the shares taken by the subscribers.  If they had loaned their capital, they would have been creditors of the borrowers for the amount loaned.  If they had loaned it to members of the grange, and the latter had been the principals in the grocery business, the shareholders, being members of the grange, would have been both lenders and borrowers, and as borrowers and principals would have been partners, whose names should have been filed with the town-clerk (G. L., *c.* 117, *ss.* 1 and 2) ; and this bill, amended if necessary, could have been maintained.  But it is not found that more than one person understood himself to be a borrower of any part of the capital.  Simpson alone understood the capital was loaned to the grange ; and his unilateral understanding could amount to no more than his loan of his own shares to himself.  The shareholders knew they were unincorporated stockholders from the time they took their shares until they sold them.  Their belief or understanding, that during that time they were not " partners " in the legal sense of the word, was a mistaken and immaterial view of the law.  They entertained the erroneous opinion, that for some unexplained reason their liability was limited in extent to the amount of the shares they took at $25 per share.  Their liability to that amount they understood.  How they were incurring liability to that amount if not as principals in the business of the store, and how they were principals and not partners in that business, are unanswered questions.

A limitation of their liability to the amount of money paid as their shares of the original capital, would have been an important safeguard which they could have obtained as special partners, under the statute of limited partnerships (G. L., *c.* 118), if they could have found some one willing to relieve them of the unlimited liability of general partners by taking it all upon himself as a general partner, associ-

ated with special partners. Without taking any steps to obtain such a limitation, they assumed its legal existence. They were necessarily to be the owners of the profits as profits, while they held their shares. But the losses might exceed the profits; the balance of loss might be more than $25 per share; and in supposing it was not necessary for them either to get some one to bear the excess of loss beyond a certain limit, or bear it themselves, they fell into a not uncommon error of law. They contemplated losses, for they understood they were liable to lose their shares of the original capital. Their intention not to bear any excess of loss beyond that limit was not carried out by a bilateral agreement that while such balance of profit as might accrue should be theirs, such balance of loss as might accrue, beyond the amount of $25 per share, should fall upon somebody else. Their understanding of such an actually existing limit of their known and acknowledged liability was, in effect, an understanding of a grocer that, although goods are bought for his store and become his by purchase, neither he nor any one else is to be a debtor for them, if he has previously lost, or if he afterwards loses, the original capital of his grocery by fire or robbery, or by the expenses and bad debts of his business.

If their liability had been affected by their understanding that it was limited to the amounts paid in by them as their shares of the original capital, this bill could be maintained. Upon that understanding they would be liable to those amounts. Their sale of their shares would not have discharged the limited amount of their liability for debts and losses incurred while they were members of the firm. But the supposed limitation of their liability was mere legal error.

The business of the store was begun and continued under the general management of " a committee " of three stockholders, appointed by the grange of which the stockholders were members, and recognized by them as a committee. All knew that the business was thus begun and continued, and no one made any objection. Everything appears to have been done by unanimous consent, because, upon the supposed legal limitation of their liability as a basis of their venture, there was no cause of dissent or dissatisfaction. No one understood that the committee were the only principals, or were carrying on the whole or any part of the business at their separate risk, or were entitled to more of the profits, or subject to more of the losses, than were appurtenant to the number of shares they had taken as original subscribers. As unincorporated stockholders who start a grocery by furnishing shares of its capital stock are partnership grocers, language being used in its ordinary legal sense, so the title of " a committee " for managing the business of the grocery signifies the agency of the managers. The committee were agents, and were understood to be agents by all parties in interest; and they were not made sole principals by a lack of skill in book-keeping that was harmless, or by acting as agents

in conducting the business in a manner known and approved by every member of the firm. They hired money with which goods were bought for the store; and the plaintiff, being one of the committee, has repaid the hired money out of his own funds. The result is as if his money had been paid for those goods. All the partners knew that goods were bought for the store on credit, or with hired money; and their silent acquiescence, with knowledge, was a ratification and authorization of that method of doing their business and increasing their grocery capital.

Shares were sold by stockholders at different times. When the plaintiff and Woodward, being two members of the committee, sold their shares to Savage, the other member, November 7, 1876, the right of the other stockholders to continue the partnership with a less numerous firm was not impaired. Not only was no attempt made to infringe it or deny it, but it was fully recognized and maintained. If the action of the plaintiff and Woodward had affected the rights of their copartners, and had not been authorized, the latter would not have been bound by it. If it had affected their rights and had been authorized by them, they could not complain of it. They did not complain, and there was no cause of complaint. The transaction was, in legal effect, a proper sale to Savage of such shares as the plaintiff and Woodward could sell at a certain price, and a proper agreement of Savage that he would buy the other shares at the same price if the owners would take it. All the other stockholders were left in the full enjoyment of their previous position. They could continue to be shareholders with unimpaired rights, or cease to be shareholders by selling their shares to whom they pleased, or by winding up the business. They accepted Savage's offer, and sold their shares to him, and thus dissolved the firm without controversy, and without any cause of controversy.

The sale of their shares by stockholders was much more than an approval of the action of the committee. It was a distinct claim that what they sold was theirs until they sold it. They did not defraud the purchaser by selling him something that belonged to others, or something that did not exist. They sold their shares, not of loaned money or loaned capital stock, but of the grocery store, which had been started by taking shares, and of which Savage became sole owner by taking the shares he agreed to take, and buying all the others. They sold the number of shares they had originally taken, and had held until they chose to hold them no longer. They sold, not their shares of a part of the store, but their shares of the whole of it. The whole included all the goods, money, credits, and apparatus that constituted the capital stock of the store, profits not excluded. And that capital stock included goods, or profits and proceeds of goods, bought for the store with money which the plaintiff and the other members of the committee hired on notes which the plaintiff, being liable to pay, has paid.

The hiring of the money is immaterial. The case is as if the money had come from the plaintiff's pocket at first, as it did at last. The practical and legal result of the transaction is, that, by their sale of their shares, the other stockholders appropriated to their own use their shares of goods, or the profits and proceeds of goods, bought for the store and paid for by the plaintiff. Such a ratification of his action leaves no equitable or technical ground on which all the losses can be thrown upon him, by stockholders who have thus taken their shares of the capital and profits.

The part of the capital raised by taking shares, and by Manahan's gift, was less than $1,400. The average amount of goods in the store was from $5,000 to $7,500. The larger part of the capital was goods, and proceeds of goods, bought with money hired by the committee. Savage finally became sole owner of all the shares. And when the other stockholders sold their shares of the whole capital stock, they knew that a part of the stock was goods, or the profits and proceeds of goods, bought on credit or with hired money. They knew that only a part of the stock, of which they were selling their shares, had been bought with their original capital or its proceeds. The larger part of what they sold has been paid for by the plaintiff. By their sale of their shares of the whole capital of the store, with knowledge that a part of it had been obtained on credit (with hired money or otherwise) as an increase of their original capital, they confirmed the act of enlargment on credit, and took their shares of the increase; and by their confirmation of the act and appropriation of the property, they bound themselves to pay their shares of the cost of the increase. They accepted, and converted to their own use, property, or the profits and proceeds of property, which was bought for their store, and for which they have not paid; and by their sale of their stock they unequivocally asserted that before that sale they were stockholders of the store, invested with all the rights and subject to all the liabilities of unincorporated shareholders of a grocery. Their community of interest in profits and losses was demonstrated by their sales of their shares of a capital stock that had not been loaned or given away, but had been used in a business in which profits and losses must occur.

*Bill dismissed as to Dodge, Manahan, Colburn, and G. A. Duncklee. Decree for the plaintiff against the other defendants.*

Foster, J., did not sit: the others concurred.